**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL WHITTED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| | ) | No. 01 C 5489 |
| v. | ) | |
| | ) | Judge John A. Nordberg |
| ANDREW JOSHUA, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Michael Whitted alleges he was wrongfully charged with murder and forced to spend over two years in jail. According to Whitted, defendant Andrew Joshua arrested him based on a single eyewitness whose story he knew was flawed in two significant ways. Before the court are cross-motions for summary judgment. The key facts and arguments can be summarized upfront.

On April 11, 1996, two cousins from Michigan traveled to the south side of Chicago to buy marijuana. Both were shot in the early evening, in separate incidents. Demetrius Hunter survived, but his cousin Derrick Hunter was found dead in the driver's seat of his car located in a vacant lot next to two abandoned truck trailers.

No eyewitness to the murder was found that night. Over the next three months, Joshua focused the investigation on three young men involved in the drug deal with the two cousins.

After interviewing two of the three suspects, Joshua felt he did not have enough evidence to charge them for the murder.

So he went back to look for an eyewitness. It was then three months after the shooting. He found a woman named Lena Haller who claimed to have seen the shooting from approximately 200 feet away. Based on this one eyewitness, Joshua arrested Whitted for murder.

But from the outset, Joshua knew Haller's story had at least one significant problem. Her version of what happened conflicted with the physical evidence. Haller claimed the shooter stood outside the driver's side door and shot the victim in the driver's seat. But the gun wounds were on the right side of the victim's body, suggesting the shooter was in the front passenger seat. Joshua told the felony review prosecutor about this problem and he refused to approve murder charges. Whitted was released from jail the next day. That was in 1996.

Nothing happened for two years. Then, in 1998, through happenstance, Joshua located the third suspect. Even though he provided no new information, Joshua decided to re-charge Whitted based on the same evidence and the same theory.

A different state's attorney came out to conduct felony review. This time Joshua took a different approach in briefing the prosecutor. He omitted the part about how Haller's statement conflicted with the physical evidence. This prosecutor, after interviewing Haller and briefly visiting the crime scene, approved murder charges against Whitted.

Unable to post bail, Whitted sat in jail for almost two and a half years waiting trial. Shortly before trial, a third prosecutor was assigned to try to the case. She interviewed Haller and concluded she was no longer credible because of possible dementia. The reason for this diagnosis is that Haller told the prosecutor the shooter was white. She previously said he was

black. Whitted is African American. Based on this change in Haller's story, the prosecutor *nolle prosequi* the charges and Whitted was released from jail.

Three months after being let out of jail, Whitted filed this § 1983 lawsuit. An amended complaint was filed several years later. The gist of the complaint is that Joshua knew Haller's story was unreliable because of two major flaws. The first is the conflict with the physical evidence described above. The second alleged flaw is that Haller could not have seen the shooting from where she was standing because her line of sight was completely blocked by the two abandoned truck trailers.

Viewed from a broader perspective, Whitted is alleging that Joshua engaged in prosecutor shopping. After being told by the first prosecutor that the evidence was insufficient, Joshua waited two years to re-charge Whitted and then kept the second prosecutor in the dark about the flaws in Haller's statement. According to Whitted, if Joshua had simply taken the time to tell the second prosecutor about the flaws, he never would have approved the charges. Stated more bluntly: a five minute conversation would have kept Whitted from needlessly spending two and half years in jail.

Joshua raises various legal and factual arguments in response. First, as to each of the individual § 1983 claims, he asserts specific legal defenses, such as the statute of limitations. Second, with regard to all claims, both the § 1983 claims and the state malicious prosecution claim, he argues he had probable cause to arrest Whitted. The two alleged flaws can be explained away by positing a few additional facts in the record. Alternatively, even if he failed to explicitly tell the prosecutor about the flaws, he made the documents available to him and was not required to give an opinion about the evidence. Third, he argues that, if summary judgment is

granted on the federal claims, one alternative would be to dismiss the state claim for lack of supplemental jurisdiction.

### Analysis of Legal Claims

Before going into greater detail on the facts, it makes sense first to analyze whether plaintiff has any federal claims even if the facts are construed in his favor. Questions have persisted throughout the long history of this case about whether plaintiff has any viable § 1983 claims. As a general matter, a plaintiff alleging he was framed for a crime faces a "difficult task" in formulating a federal cause of action under § 1983, a point the Seventh Circuit has noted several times. *See, e.g., Manning v. Miller*, 355 F.3d 1028, 1031 (7th Cir. 2004). In addition, the law changed during discovery, with new decisions being issued by the Seventh Circuit and the U.S. Supreme Court.

Now, after lengthy discovery and supplemental briefing, it has become clear that all of Whitted's federal claims are not viable. From the start of this case, the parties have argued whether the two-year statute of limitations for the § 1983 false arrest claim accrued upon plaintiff's arrest in 1998 or upon his release from jail in 2001. In light of the Supreme Court's ruling in *Wallace v. Kato*, 549 U.S. 384 (2007), Whitted now concedes that the issue has been definitively resolved against him. He also recognizes that his § 1983 malicious prosecution is barred by *Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001), and has dropped other claims such as the alleged manipulation of the line-up. The remaining federal claim is the type of Fourteenth Amendment due process claim mentioned in *Newsome*. However, as Judge Shadur discussed in *Johnson v. Garza*, 564 F.Supp.2d 845, 854 (N.D. Ill. 2008), such a claim rests on a violation of *Brady v. Maryland* and is therefore not viable where, as here, the case did not go to trial.

This leaves only the state law malicious prosecution claim. Joshua primarily argues that we should grant judgment in his favor on the merits of this claim. However, he also briefly states that we could dismiss the claim for lack of supplemental jurisdiction. It obviously makes sense to address the latter argument first.

Under 28 U.S.C. § 1367, we have discretion to retain or remand supplemental state law claims after dismissing the federal claims. *Adkins v. Illinois Cent. R. Co.*, 326 F.3d 828, 836 (7th Cir. 2003). When the federal claims are dismissed before trial, there is a general presumption that pendent claims should be "left to the state courts." *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1252 (7th Cir. 1994). Yet, as the Seventh Circuit has stated, the presumption is not automatic. *Williams Electronics Games, Inc. v. Garity*, 479 F.3d 904, 906-07 (7th Cir. 2007) (court may retain jurisdiction where "substantial federal judicial resources have already been expended on the resolution of the supplemental claims"); *Timm v. Mead Corp.*, 32 F.3d 273, 277 (7th Cir. 1994) (court should consider "judicial economy, convenience, fairness, and comity").

Exercising our discretion, we find that fairness and judicial economy favor retaining jurisdiction. Discovery has been extensive and this case has been ongoing for some time. To re-start it now in state court would increase the delay and perhaps lead to additional discovery. *See Williams*, 479 F.3d at 906 (sending case to state court "might require a reopening of pretrial discovery or other adjustments[,] thus delaying the outcome of the case and running up the expense of the litigation"). Moreover, substantial judicial resources have already been expended by both this Court and the parties in addressing the present arguments in the summary judgment briefs and exhibits.

## The Malicious Prosecution Claim

To assert a claim for malicious prosecution under Illinois law, a plaintiff must show: (1) the defendant commenced or continued a criminal proceeding; (2) the proceeding was terminated in plaintiff's favor; (3) there was no probable cause to arrest him; (4) malice; and (5) damages. *Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996). Although defendant argues that plaintiff cannot establish the second and fourth elements, he directs his major effort against the third element of probable cause.

## I.     Probable Cause.

To assess probable cause, we must set forth the facts in greater detail. Our initial and primary focus will be on defendant's motion, meaning we will view disputed facts and reasonable inferences in plaintiff's favor. In Section IV, we address plaintiff's cross-motion.

On April 11, 1996, Demetrius and Derrick Hunter drove to Illinois to buy marijuana from Peter Gukina who lived in Harvey, Illinois. This was not the first drug deal between them. The plan was for the two cousins to first meet Gukina at a Burger King in Markham, Illinois and then for everyone to drive to Harvey. The two cousins drove a blue Nissan Maxima. Gukina drove a black Chevy. He was accompanied by Demetrius and Donovan Whitted.

After meeting at the Burger King, the two groups drove to Harvey. There, they split up. Derrick's cousin, Demetrius Hunter, got out of the blue Nissan and waited outside by a fence, along with Gukina and Donovan Whitted. Derrick Hunter, the murder victim, stayed in the driver's seat of the blue Nissan and was joined by Demetrius Whitted in the front passenger seat. They drove off in the blue Nissan.

According to Demetrius Hunter, while they waited outside, Donovan Whitted suddenly pulled out a gun and started shooting him. Demetrius Hunter ran but was shot several times in the legs and hand. As he fell to the ground, he saw his cousin driving east-bound on 148th Street in the blue Nissan with Gukina was running after the car. He also noticed that the black Chevy was gone, as was Demetrius Whitted.

Minutes later police found Derrick Hunter dead in the driver's seat of the blue Nissan. The car was in the middle of a vacant lot four blocks away. The lot was on the northwest corner of 148th Street and Marshfield. Just to the east of the car, about a foot away, were several abandoned truck trailers. Here is a police photo taken that night:



(Pl. Ex. 2.)

Detective Joshua arrived soon after and was followed by Jill Rizzs, an evidence technician from the Illinois State police crime lab. Both examined the crime scene. Four shell casings were found inside the car. One on the right front passenger floor; one between the

console and the front passenger seat; one on driver's side floor under the fuel release button; and one on the driver's door armrest. Also found inside the car, under the driver's seat, was a "spent projectile," which we assume means a bullet that has been fired from a gun. Blood was found on the steering wheel, the driver's door, and the center console.[1]

The exact distance between the passenger-side of the blue Nissan and the adjacent truck trailer was, as noted by Rizzs in her report, one foot and ten inches. Rizzs also saw a scuff mark on the trailer's tire which was apparently caused by the opening of the front passenger door, suggesting to Rizzs that the "suspect" (her word) left the car from the front passenger seat. Rizzs also stated that the blood evidence suggested the victim was killed while sitting in the driver's seat. Putting these observations together, Rizzs seemed to conclude (though her report doesn't say so explicitly) that the shooter sat in the front passenger seat when he shot the victim who was in the driver's seat.

That night, police officers conducted a "neighborhood canvass" walking door to door looking for eyewitnesses. None were found. Joshua personally participated in this search. Haller later claimed she had been standing outside her sister's house trying to tell police what she saw. Joshua and Haller had known each other for many years. Yet for some reason, they did not find each other that night.

The autopsy was performed the next morning with Rizzs in attendance. The autopsy report states that the bullet wounds were along the right side of the victim's body, with one

---

[1]Blood was also found on the carpeting of the right rear passenger seat, along with an open box of BB's, two pieces of evidence never explained nor linked to any theory of the case by either side. The police later determined that this blood did not come from the victim.

exception being a wound to the back of victim's left hand and thumb. The report notes that there was evidence of close range fire for some wounds, but not for others.[2]

After viewing the autopsy, Rizzs went back to the blue Nissan, then in police storage, and removed the plastic arm covering from the front passenger seat and sent it to the crime lab, further suggesting she was working under the assumption that the shooter was in the front passenger seat.

The day after the shooting, Joshua interviewed Demetrius Hunter who said he and his cousin were in the neighborhood to visit his cousin's girlfriend but he did not mention the drug deal. Several months later, Joshua re-interviewed him and he then admitted that he and his cousin went to Harvey to buy marijuana from Gukina. A week later, Hunter viewed pictures of Gukina, Donovan Whitted, and Demetrius Whitted and identified them as the three men he saw that night.

Based on Joshua's own police reports, it is clear he was focusing his investigation on these three men at this point. They were the obvious, and really only, suspects. They were involved in a drug deal with the victim. The physical evidence suggested Derrick Hunter had been shot by someone in the front passenger seat, and Demetrius Whitted was seen minutes before the killing riding in that seat. Gukina was seen chasing the blue Nissan as it drove in the

---

[2]Defendant argues that the statement in the autopsy report about lack of evidence of close range fire for some wounds means that those wounds *necessarily* were caused by long range fire. But defendant provided no expert testimony on this point, and it is not clear whether such evidence is *always* present in cases of close range fire. Further evidence would have been helpful to clarify this ambiguity. *See, e.g.,* Denton, Segovia, Filkins, "Practical Pathology of Gunshot Wounds," *Archives of Pathology and Laboratory Medicine*: Vol. 130, No. 9, pp. 1283-1289 (Oct. 17, 2005) ("It is absolutely critical that the forensic pathologist recognizes that the absence of soot or stippling does not absolutely mean that the wound was not fired from close range. Intermediate targets and clothing can screen out stippling and soot even when the muzzle of the gun is pressed up against the clothing.").

direction of the lot where the victim was found. The black Chevy had been driven away and the third suspect, Donovan Whitted, was not around. All three men thus had a close physical and temporal connection to the murder scene.

Joshua located the fingerprints of Demetrius and Donovan Whitted from existing police records and sent them to the police lab for comparison with the prints Rizzs took from the passenger door handles and front armrest. Joshua next sought to interview the suspects. After several stake-outs and high-speed car chases, two of the suspects were brought in for an interview. The third, Gukina, got away in a car chase.

When interviewed, Demetrius Whitted admitted he got into the front passenger seat with the victim minutes before the killing but claimed he did not know what ultimately happened to the victim because a robber in a green ski mask stopped the car and ordered him out and he then jumped in a car of a passerby. Joshua seemed suspicious of this alibi.[3] Donovan Whitted in his interview admitted shooting Demetrius Hunter in the field but claimed it was in self-defense.

Even though the circumstantial evidence pointed to these three men, Joshua apparently felt he did not have enough evidence to charge them. (The fingerprint check came back negative during this general time.) So on July 25th he went back to the neighborhood in what he described in his police report as a "last effort" to find a witness. This report (MW 39-40) describes this effort.

Joshua first located Vera Poindexter who lived at the southeast corner of 148th and Marshfield, diagonal from the lot. Poindexter told Joshua that a woman named Lena Haller had

---

[3]*See, e.g.,* MW 22 (question by Joshua:  "Demetrius, you [are] telling me that after you were shot at by someone unknown, you got into a hypes car, someone you don't know and he took you to Calumet City at about Torrence Ave?").

seen the shooting while standing outside her sister's house, the one next to Poindexter's. An hour

and a half later, Joshua interviewed Haller. Here is his summary of the interview:

> Mrs. Haller states that she was visiting her sister at 14803 Marshfield Ave. on the
> night of the shooting, and that she was standing outside of her sister's house
> smoking a cigarette because she couldn't smoke in her sister's house because her
> sister is suffering from cancer, and that while standing in between Mrs.
> Poindexter's house and her sister's, she saw the blue car turning into the lot of the
> abandoned building. Mrs. Haller states that it appeared that the blue car was
> trying to go through to the other street (Spaulding) but it couldn't go any farther.
> Then she saw this brown/gold colored vehicle pulling up next to the blue car with
> an unknown male black who was tall and muscular with a short haircut and very
> light facial hair exit the passenger side of the car and shot into the blue vehicle.
> This person then ran past her not realizing she was standing there and hopped a
> fence of a house across from her sister's house and disappeared on the next street.
> When the officers arrived finding the blue car, that same guy came back looking,
> pretending to see what was going on, that's when I told Vera, "look at this – the
> guy that shot that person in that car is standing over there." I pointed him out to
> her. I went to tell one of the officers there that he was standing there, but this big
> fat cop told me to get the hell back or he was going to lock me up, so she said
> forget it, saying nothing.

(MW 39-40.)[4] Joshua then showed Haller pictures of the three suspects. When she failed to

identify any of them, he showed her a picture of relatives of the men, and she picked out Michael

Whitted. Joshua next drove by the homes of people related to Michael Whitted and found a gold-

colored Chrysler registered to Brenda Whitted who is Whitted's mother. (Whitted had his own

car at the time, but it was green pick-up truck.) Joshua took a picture of the car and Haller

identified it as the one she saw.

The next day, July 26th, Joshua picked up Whitted at 2:00 p.m. and took him to the

police station. Later that night, an assistant state's attorney named McQuaid arrived to conduct

the felony review. Joshua told him, or one of his assistants, that Haller's story of a driver's side

---

[4]To enhance readability, we converted the quotation to normal capitalization and
corrected a few obvious typos.

shooting conflicted with the physical evidence. McQuaid refused to approve the charges.

Although we do not have direct testimony from McQuaid on why he refused to approve charges,

it is reasonable to assume that the contradiction with the physical evidence was the reason. No

other reason has ever been suggested.[5]

For two years, the case went dormant. Joshua found no new evidence, nor addressed the

problem identified by McQuaid -- at least, no police report evidences any such activity. Then in

October 1998, he found and interviewed Gukina, but he provided no information linking Whitted

to the events that night. The next day Joshua arrested Whitted, again relying solely on Haller's

statement.

This time a different prosecutor, William Delaney, came out to conduct the felony

review. According to Delaney, Joshua gave him "some reports." (Dep. 25.) Delaney in his

deposition didn't remember all of the documents given to him, but did specifically recall

reviewing a police diagram of the murder scene prepared by an Illinois state evidence technician.

(Dep. 37.) Joshua also told Delaney "who was there in terms of witnesses." (Dep. 25.) This was

consistent with Delaney's practice:

---

[5]The above facts come from Report MW 39-40. Two points are worth noting about this important document. First, although it describes how Joshua located Haller on July 25th, the report itself is dated July 29th, suggesting it was prepared four days after the event. (Joshua's other reports are dated contemporaneously with events described therein.) This would mean that the report was prepared *after* McQuaid told Joshua about a flaw in Haller's statement. Second, the timing of events described in report MW 39-40 are hard to reconcile with those described in other reports by Joshua during the same period. For example, report MW 39-40 states that Joshua interviewed Haller at 11:30 a.m. on July 25th, that he located the gold car at 1:30 p.m. the same afternoon, and that he showed Haller a picture of the car at 2:00 p.m. So by mid-afternoon on July 25th, Joshua presumably believed that Whitted was the primary suspect. Yet, report MW 21 describes how Joshua brought Donovan Whitted into custody *later in the evening on July 25th* and then goes on to state that the "only remaining suspect" not then in custody was Gukina. Yet Whitted was not taken into custody until the next day. Why didn't Joshua in this police report refer to Whitted as one of the suspects still at large?

> If I'm notified, I want to determine from [] whoever I'm speaking to, a detective
> or sergeant or whoever, first of all what the facts of the case are, who, if anyone is
> in custody, what witnesses there are, what physical evidence there is, and if there
> are eyewitnesses, are they available to speak to.

(Dep. 12.)

After getting the run-down from Joshua, Delaney interviewed Haller at her home for 45 minutes and then visited the crime scene. But he stayed for less than five minutes and did not go back and stand at the spot outside of 14803 Marshfield where Haller claimed to have been standing nor did he "measure distances." Instead, he relied on the police diagram to get an "idea of where it happened." (Dep. 37.)

In his deposition, Delaney estimated that Haller had been standing about 40 feet from the spot of the shooting. (Dep. 33.) But the surveyor's measurement, submitted by plaintiff and undisputed by defendant, shows that the actual distance was 200 feet, significantly longer than Delaney thought. *See* Pl. Fact # 21. Also in his deposition, Delaney did not raise any concerns about Haller's viewpoint being blocked nor express any doubts her story being in conflict with the physical evidence. He said he had "no doubts" about her statement. (Dep. 33, 42.)[6] After

---

[6]One possible explanation for Joshua's unequivocal confidence and also his apparent misestimation about the distance Haller was from the shooting is that he was misled by the police diagram he relied on. The only document that fits this description is plaintiff's Exhibit 8, which is labeled as a "drawing not to scale" and was prepared by someone working for the Illinois state police. The parties did not discuss this document in detail in their briefs, but in reviewing this document, we noticed that the diagram differs in significant ways from a Yahoo map of the scene (Pl. Ex. 1) and from plaintiff's exhibit 7. Specifically, the police diagram seems to show Spaulding Avenue as an east-west street whereas the Yahoo map shows it as a diagonal street running northwest to southeast. The police diagram places the murder scene *northeast* of the intersection of 148th and Marshfield whereas plaintiff's exhibits 6 and 7 place it *northwest* of the same intersection. The police diagram depicts three houses south of the paved alley whereas exhibits 6 and 7 show only two. Not only does this police diagram appear to be wrong, but it is wrong in a way that could suggest both that Haller was much closer to the scene *and* that she had an unobstructed view. No information has been provided about who created the document or who gave it to Delaney.

Delaney interviewed Haller and briefly visited the crime scene, he approved murder charges against Whitted.

Whitted remained in jail over two years waiting for trial. About two weeks before the scheduled trial, a new prosecutor (Colleen Clarke) was assigned to try the case. Along with Joshua she visited the murder scene and interviewed Haller who stated for the first time that the shooter was a white man.  Based on this change in Haller's story, Clarke determined that Haller had become unreliable, which she attributed to "advanced age, and possibly diminished capacity." Clarke dismissed the case via *nolle prosequi*.

**Blocked View.** To show that Haller's view was blocked, plaintiff hired a surveyor and a trial consultant.  From their work, the following exhibit (Pl. Ex. 7 ) was created showing Haller's viewpoint from outside her sister's house:





This exhibit shows that, if Haller was standing at the spot outside her sister's house, she could not have seen the shooting. This factual contention is a linchpin of Whitted's case. And

defendant has provided no evidence or argument to rebut it other than the one (addressed below) that Haller may have moved somewhere else. But assuming she remaining standing outside her sister's house, defendant has not submitted any evidence to suggest, for example, that she could have somehow seen around trailers. Nor has he contested the methodology or assumptions made by plaintiff's experts, nor submitted his own expert.[7]

His only argument is to speculate that Haller may have moved during the event to get a better view. Of course, this argument implicitly concedes she could not have seen the shooting from her initial position. As explained below, this argument falls far short of the evidence needed to support summary judgment in defendant's favor.

Defendant begins by noting that the police report never specifically states that Haller remained "frozen in place" in front of her sister's house. Defendant thus believes that it is *possible* she moved. And he speculates she in fact did so based on a principal of human nature – namely, "[w]hen a person sees an unusual event occur, it is natural for them to watch the event, and move to see if they cannot see clearly." The unusual event supposedly prompting her to move was the blue car turning into the vacant lot.

This argument at best creates a fact dispute. It also lacks concrete evidence to support it. No witness has ever stated that Haller moved down the street. Joshua's police report says nothing about it, even though the report describes many peripheral details such as the fact that Haller was smoking outside because her sister had cancer. Although his report does not explicitly say that Haller *remained* in one place, it strongly implies as much. The word

[7]Defendant filed a motion to strike exhibits 6 and 7 on the ground that they only address the objective question of whether Haller could have seen the shooting and not the subjective question of whether Joshua knew about this fact. While true, this is not a ground to strike the exhibits.

"standing" is used three times, first to describe Haller's position *before* the event, then *during* the event, and then *after* it. Notably, the report uses the word while -- "*while* standing . . ., [Haller] saw . . . ." Joshua also didn't mention this new theory in his deposition. Nor in his grand jury testimony. Neither did Delaney who testified that Haller was standing at her sister's house (14802-03 Marshfield) when she saw the shooting. Defendant's attorneys are therefore relying on a theory that neither their client nor another key witness ever mentioned before now.

Defendant's theory is also incomplete. If Haller moved, where did she move to? Defendant doesn't explain, saying only that she moved to "another location." Based on plaintiff's exhibits, we see only two possibilities, and both raise questions. One possibility is that she went south on Marshfield, but looking at plaintiff's Exhibit 7, it is far from clear that she could have seen around the trailers no matter how far down the street she went. The other possibility is that she first went north, to the corner of 148th and Marshfield, and then west along 148th Street. Based on Exhibit 7, she would have had to go about a half of block down 148th to get to a point where she could see around the trailers. And then, after the shooting, she presumably went back to her sister's house in time to see the shooter hopping the fence across the street. This explanation, while possible, would require a series of fairly rapid movements by an elderly woman. And it would raise another question -- why was all this movement not mentioned in the police report? In sum, this theory is too tenuous to grant summary judgment to defendant.

The next question is the subjective one: did Joshua know of the blocked view? Surprisingly, we could not find a clear statement from his deposition on this important question. In any event, the contextual evidence is enough to create a fact issue. Joshua was the lead

investigator and worked on the case, albeit off and on, for two years. He interviewed all the witnesses, prepared numerous and detailed police reports, and presumably spent significant time thinking about it. He built the case around this one witness. Further, he knew the first prosecutor thought Haller's story was shaky.  Joshua thus had good reason to scrutinize her story. He let the case sit for two more years. There was no rush, no deadline.  Joshua also was familiar with the neighborhood.  He investigated the scene and canvassed for witnesses on the night of the shooting; he had seen the vacant lot "probably a thousand times" in his travels through Harvey. Asked in his deposition when he was last there, he said:  "I'm out and about in Harvey every day.  As a matter of fact, I passed that location an hour ago." Finally, he was experienced, having worked on around 30 murder cases. From these facts, a jury could reasonably conclude he knew of the blocked view.

**Contradiction With The Physical Evidence.**  Plaintiff's evidence regarding the second flaw is more direct, as there is no question that Joshua knew of the potential problem.  He admitted telling the first prosecutor about it, evidencing both that he knew of the problem and viewed it as serious. In his deposition, Joshua gave this explanation:

> [I]t had to have happened from [the passenger side] unless someone [was] capable of reaching in from the driver's side and positioning their arm in such a way that they can shoot towards themself as well as the victim.

(Dep. 34.)  He also made clear that Haller's version differed from his own. (Dep. 55.) In fact, he used the word "impossibility" to describe her story. (Dep. 56.)

In response, defendant's attorneys again come forward with new theories to explain the apparent flaw. Two are offered this time. The first is that Haller actually believed the shooter was on the passenger side, thus her story was consistent with the physical evidence.  Defendant

believes this theory is possible because the police report is fuzzy about which side the shooter was on. Even if the report is ambiguous, Joshua's deposition testimony is clear. He said Haller told him the shooter was on the driver's side. (Dep. 51.)[8]

The second theory goes in the opposite direction. It speculates that the victim got out of the car, turned his body at various angles so that gunshot wounds all ended up on his right side, and then got back into the driver's seat of the car. *See* Def. Resp. at 10-11. This theory is one that again has not ever been asserted by Joshua himself insofar as we can tell. It is not in Report MW 39-40, nor in his deposition testimony, nor in his grand jury testimony. Instead, he states in each case that the man shot "into" the car, a description at odds with an *outside* shooting. The same point applies to Delaney who testified that Haller told him the man "began firing *into* the car." (Dep. 31.) Finally, this theory is also at odds with the implicit conclusions of the crime scene investigator.[9]

**Other Evidence.** In addition to explaining why he believes the two alleged flaws do not undermine probable cause, defendant also points to other evidence supposedly bolstering Haller's story. Specifically, he relies on these five arguments: (1) Haller gave a specific description that matched plaintiff; (2) she got a good view of the shooter because he ran directly past her; (3) Haller's description of the shooter's car matched a car owned by plaintiff's family;

---

[8]Of course, another possible explanation for the ambiguity in the police report would be that it was intentional, created to obscure the flaw from a later prosecutor.

[9]Defendant also argues that the position of the shell casings, the spent projectile, and the blood evidence are inconsistent with a shooting inside the car, thereby allowing for the possibility that it took place outside the car. But we fail to see the logic of this argument when *all* this evidence was found *inside* the car. Under defendant's theory, all four shells would have made a fairly remarkable upstream journey, popping over the victim's body, navigating through a partially open car door, and (for one shell) sliding across the seat to the passenger-side floor.

(4) plaintiff was related to the three men who were the primary suspects; and (5) Vera Poindexter confirmed parts of Haller's story.

But these points, even if true, do not directly rebut the two flaws. The same underlying reason that would explain the flaws -- either Haller's incipient dementia or some more sinister motive to frame Whitted – could explain these five points. Moreover, the individual points each have their own weaknesses. Consider Haller's identification of a gold car. The mere fact that a gold car could be found among all the relatives of Whitted is not especially strong evidence when Whitted himself was driving a green pickup at the time.[10] As for the claim that the shooter ran right past Haller, a point defendant mentions often in his briefs, Delaney testified that Haller told him in 1998 that the shooter didn't run past her but instead left the scene by getting back into the gold car. If true, then Haller had already changed her story in one significant way by 1998. Under the reasoning of the third prosecutor, this should have led to a conclusion that she was unreliable.

Moreover, balanced against these points are other inferences supporting plaintiff. The investigation unfolded in an arguably suspicious way. Until Haller was found, no one had mentioned Michael Whitted as being involved in the events that evening. The entire focus had been on three other suspects. One of them, in fact, was sitting in the front passenger seat minutes before the shooting, which is the spot where both Joshua (initially) and Rizzs thought the shooting took place from, and this suspect later offered a suspicious alibi about a robber in green ski. But then, just as the investigation was closing in on these three men, Joshua located Haller

---

[10]Also Poindexter, in her deposition, remembered seeing two cars drive by quickly that night just before she heard gunshots. She described their color this way: "the first car was gray, like charcoal gray, and the other car was a dark color, too." (Dep. at 22; *see also* at 5, 29.)

and the investigation took a U-turn. The case now focused on a new person, not the original three suspects. The theory changed also, switching from a passenger-side to a driver-side shooting. And then, the only rationale to explain why Whitted would have been involved in such a murder was Joshua's guilt-by-association belief that someone from the extended Whitted family must have been involved.

Additional suspicion could be found in the way Joshua handled the case from 1996 to 1998. After being told that Haller's statement was flawed, Joshua waited two years. Yet, he did not do any further investigation, nor change his theory of the case to account for the flaw. The only things that changed were a new detective joined the case to assist Joshua, replacing the old one from 1996, and a new prosecutor came out to conduct the felony review.

Joshua argues that, even if he did not explicitly tell the prosecutor about the flaws, he at least gave him all the documents, and the prosecutor interviewed the key witness and visited the crime scene. He is claiming, in effect, that the prosecutor had all the pieces of the jigsaw puzzle and it was his job to put them together.

This argument, at a minimum, rests on disputed issues of fact. The evidence is unclear on what documents Delaney was given and what he knew. He testified that he was given only "some" of the documents. Delaney testified that he typically relied on the officer on the scene for a run-down of the evidence, suggesting he may not have reviewed the documents carefully. Delaney expressed no doubts about Haller's statement. All this circumstantial evidence could suggest he did not discover the two flaws on his own.

Finally, the parties cite to only a few cases, which is not surprising given the fact-specific nature of the probable cause inquiry. Relying on the general principle that one credible

eyewitness can be enough to establish probable cause, defendant relies heavily on *Tangwell v. Stuckey*, 135 F.3d 510 (7th Cir. 1998). But the flaws of the eyewitness in *Tangwell* were neither as serious nor all-encompassing as alleged here. They involved discrepancies of hair and eye color and estimated weight. A closer fit in our opinion is *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006 (7th Cir. 2006). There, an FBI agent first presented the evidence implicating the defendant to a U.S. attorney who told the agent it was not enough. Thereafter, the two defendant police officers presented evidence to the state's attorney, but they gave him only an "incomplete and one-sided" summary. *Id.* at 1015. From this and other evidence, the Seventh Circuit held that a jury could find that the officers "realized the weakness of their case, and therefore manipulated the available evidence to mislead the state prosecutor into authorizing [the] arrest." *Id.* at 1016. The same conclusion could be drawn by a jury here.

## II.  Favorable Termination.

Relying on an affidavit submitted by the prosecutor assigned to try the case in 2001, defendant argues that charges were dropped only because of Haller's age or possibly because of her age-related dementia. Therefore, defendant argues, there was no favorable termination.

In *Swick v. Liautaud*, 662 N.E.2d 1238 (Ill. 1996), the Illinois Supreme Court held that a favorable termination for purposes of a malicious prosecution claim occurs when the prosecutor "formally abandons the proceeding via a *nolle prosequi*, unless the abandonment is for reasons not indicative of the innocence of the accused." *Id.* at 1242-43. The following are examples of the latter scenario:

> when the *nolle prosequi* is the result of an agreement or compromise with the accused, misconduct on the part of the accused for the purpose of preventing trial, mercy requested or accepted by the accused, the institution of new criminal

proceedings, or the impossibility or impracticability of bringing the accused to trial.

*Id.* The burden rests with the plaintiff to show that the circumstances surrounding the abandonment "compel an inference" that the prosecutor lacked reasonable grounds. *Id.* The plaintiff in *Swick* relied solely on the *nolle prosequi* order without presenting other evidence, and the Supreme Court held that the bare order was not enough and remanded the case to allow further evidence to be submitted. *See also Logan v. Caterpillar, Inc.*, 246 F.3d 912, 925 (7th Cir. 2001) ("To determine whether the proceedings against Logan were terminated in his favor, we must look past the form or title of the disposition and examine the circumstances surrounding the entry of the *nolle prosequi*.").

Here, Whitted is not merely relying on the *nolle prosequi* order but is also relying on all the evidence discussed above. We find this evidence creates a fact issue. The prosecutor's affidavit does not alter this conclusion. She claims Haller was credible initially but became unreliable *after* 1998. But a jury would be entitled to discount her affidavit for several reasons.

First, the affidavit fails to address the two alleged flaws. How does the prosecutor account for the physical evidence contradiction or the blocked view? Does she agree with the theories now offered by defendant's attorneys? Her affidavit is silent about these important questions. She expresses total confidence in Haller's story.[11]

Second, the affidavit opines about matters outside the knowledge of the prosecutor. The affidavit makes two assertions about Haller's mental state: (i) she may have been suffering from

---

[11]The affidavit also does not comment on whether the prosecutor's decision was influenced in any way by the fact that the Illinois crime lab, shortly before trial, compared Whitted's fingerprints to those taken from the blue Chevy and concluded there was no match. It does not appear that Joshua requested this fingerprint comparison in 1996 or 1998 when Whitted was arrested.

age-related dementia in 2001, and (ii) she was *not* suffering from the same condition in 1996 or in 1998.[12] Both assertions are necessary for defendant's argument because if Haller had already begun to suffer from dementia in 1996, this would actually support plaintiff by providing an explanation for the flaws.

The prosecutor at least has a basis for making the first assertion concerning Haller's mental state in 2001. Even then, the basis is slim. The prosecutor, who is not a psychiatrist insofar as we know, interviewed Haller only once. And the only statement from the interview cited to support the diagnosis is that Haller changed her story in one aspect. But why does one change in her story necessarily lead to a global assessment of her mental condition? The prosecutor's second assertion, however, rests on no first-hand knowledge. She was not involved in the case in 1996 and 1998 and never interviewed Haller then. She therefore has no way to compare Haller's mental state then to her mental state in 2001.

## III. Malice.

Defendant argues that Whitted has no evidence of malice and asserts that he had no bad motives. While it is true that Whitted has not provided an overarching theory for why Joshua would have wanted to frame him, he is not required to have one. It is enough for him to show that Joshua acted with malice, meaning that Joshua intentionally pushed this case forward knowing Haller's story was impossible. All the evidence summarized above can be relied upon to establish this point.

---

[12]The affidavit also mentions "age" as a separate possible explanation. But how can the mere elapse of two years turn a previously reliable witness into an unreliable one?

**IV.    Plaintiff's Cross-Motion For Partial Summary Judgment On Liability.**

The briefs contain little, if any, discussion specifically geared towards plaintiff's cross-motion. The issues and arguments are the same except that we now view the facts and inferences favorable to defendant. As indicated above, plaintiff has strong evidence in his favor. Nevertheless, we do not find that it is enough to grant summary judgment in his favor, especially on the question of malice.

As an initial matter, a jury would be in a better position to assess plaintiff's arguments. His key argument about Haller's line of sight depends on a clear understanding of the lay-out of the scene and location of the trailers and of Haller's exact position. Trial exhibits and expert testimony would allow for a more thorough understanding of the parties' arguments and counter-arguments.

Moreover, while we have found that defendant's theories for explaining away the two flaws are speculative, we cannot say at this point that they are inconceivable. One important issue, of course, is the defendant's state of mind.  What did he know and believe about the flaws, particularly the blocked view? Defendant argues, among other things, that this flaw was not evident at the time and only became clear later when plaintiff hired expert witnesses and relied on maps and diagrams. With regard to the physical evidence contradiction, a jury can draw inferences either way on Joshua's claim that the prosecutor knew about this flaw and decided to proceed with the prosecution anyway.  Among other things, the prosecutor interviewed Haller for 45 minutes.

Finally, a jury would be in a better position to assess the contextual evidence. While plaintiff can point to facts suggesting that Joshua may have intentionally manipulated the

process, the evidence is not unequivocal. As noted above, there has never been a clear theory offered for why he would have wanted to frame defendant. Also, while he downplayed bad facts, especially by not explicitly disclosing the physical evidence contradiction to the second prosecutor, he did not take other steps that would have completely papered over the problems. He could have stated in his report that Haller saw the shooter on the passenger side, thereby completely hiding the contradiction. As for the blocked view, if it was so clear that Haller couldn't see, wouldn't Joshua have realized that this fact inevitably would be discovered? And if so, then why not cover it up or at least anticipatorily explain it away in the police report?

## CONCLUSION

For the above reasons, defendant's motion for summary judgment is granted in part and denied in part. Judgment is granted in defendant's favor on all the federal counts. Plaintiff's cross-motion for partial summary judgment on liability is denied.  A status hearing is set for 2:30 p.m. on September 30, 2009, to prepare this case for trial.

**ENTER:**

_____
**JOHN A. NORDBERG**
**Senior United States District Court Judge**


**DATED: _____July 20, 2009_____**